UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAVID COOPER,

                      Plaintiff,

v.                                          **DECISION AND ORDER**
                                                  08-CV-468S

NIAGARA COMMUNITY ACTION PROGRAM,

                      Defendant.

## I. INTRODUCTION

In this employment discrimination action, Plaintiff David Cooper alleges that his former employer, Defendant Niagara Community Action Program ("NCAP"), subjected him to disparate treatment with regard to administrative support, performance evaluations, training, and salary increases because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d) et seq., New York State Human Rights Law, N.Y. EXEC. LAW § 296, and section 194 of the New York Labor Law.

This Court has federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his state claims pursuant to 28 U.S.C. § 1367. Presently before this Court is Defendant's Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.[1] For the reasons discussed

---

[1] In support of its motion, Defendant filed a memorandum of law (Docket No. 40), a Rule 56.1 Statement of Undisputed Material Facts (Docket No. 37, "Def's Statement"), the Declaration of Joseph S. Brown, Esq. with Exhibits A-E (Docket No. 36), the Declaration of Carol Palumbo with Exhibit 1 (Docket No. 34), the Declaration of Suzanne Shears with Exhibits 1-26 (Docket No. 35), the Reply Declaration of Carol Palumbo, with Exhibits A-B (Docket No. 48), and a reply memorandum of law (Docket No. 49). Plaintiff filed a memorandum of law in opposition (Docket No. 43), a Rule 56.1 Statement of Disputed Material Facts (Docket No. 44, "Pl's Statement"), the Affirmation of Richard H. Wyssling, Esq. with

below, Defendant's motion is granted.

## II. BACKGROUND

### A. Undisputed Facts

In "late 2002," Plaintiff, an African-American male, began working for NCAP, a non-profit agency providing services to needy and working families in Niagara County. (Def's Statement, ¶¶ 1, 3, 13.)[2] Those services include, among other things, budget counseling, food and clothing pantries, housing advocacy, and family development. (Shears Decl. ¶ 3.)

One of the programs NCAP operates is a Neighborhood Centers Program ("NCP") with locations in Niagara Falls, Lockport, and North Tonawanda, New York. (Def's Statement, ¶ 2.) Each NCP is staffed by one Community Outreach Worker, whose duties include providing outreach, advocacy, information, referral, and follow-up assistance to poor, homeless, disabled, and senior individuals. (Def's Statement, ¶¶ 2, 15; Shears Decl. Ex. 1.)

Plaintiff was the Outreach Worker assigned to the Niagara Falls location, known as the Rose Marra Center. (Def's Statement, ¶¶ 3, 13.) Mary Ann Cox and Linda Harrington, both Caucasian, were the Outreach Workers assigned, respectively, to the Lockport and North Tonawanda locations. (Def's Statement, ¶ 4; Pl's Aff. ¶ 44.) All outreach workers are supervised by Carol Palumbo, NCAP's Family Development and Nutrition Coordinator. (Def's Statement, ¶ 5.)

---

Exhibits A-B (Docket No. 45), and the Affidavit of David Cooper (Docket No. 46).

[2] Plaintiff began as a "temporary worker" in late 2002, and accepted an offer of regular employment in April 2003. His probationary period ended on July 9, 2003. (Def's Statement, ¶¶ 13-14.)

2

### NCP's Niagara Falls Facility

The Rose Marra Center is a small space, consisting of Plaintiff's office in the front, and a two-bedroom apartment in the back. (Def's Statement, ¶ 6.) Palumbo's office occupies one of the bedrooms, and the other is used to store food for distribution to NCAP clients. (Palumbo Decl. ¶ 7.) The apartment's kitchen and the living room are common areas used for business purposes. (Def's Statement, ¶ 6; Pl's statement ¶ 9.)

Initially, the Center's fax machine was located in Palumbo's office. (Def's Statement, ¶ 7.) Because confidential files were stored there, only Palumbo and one other individual had access to her office. (Def's Statement, ¶ 7.) After Plaintiff was unable to access the fax machine for a client, he complained about its location. (Def's Statement, ¶ 7, Pl's Statement ¶ 6.) A short time later, the fax machine was placed in the common work area. (Brown Decl. Ex. E, 117:6-9.)

### Plaintiff's Responsibilities

As previously noted, Plaintiff's duties involved providing services to individuals who sought help at the Rose Marra Center. (Def's Statement, ¶ 15.) He was responsible for screening potential clients, and was authorized to determine whether a particular client should receive food, clothing, or referrals. (Def's Statement ¶ 23.) Plaintiff also was required to document the goods and services distributed to clients at his location. (Def's Statement, ¶¶ 17-18.) This involved entering client information in a computer database from which monthly reports of services provided could be generated. (Def's Statement, ¶¶ 18-19.) Maintaining complete and accurate records is a critical job function for Outreach Workers because NCAP relies on its records to receive, maintain, and secure funding from federal and state grant programs. (Def's Statement, ¶¶ 17, 20-22.) Failure to maintain

3

proper records could result in NCAP being suspended, denied reimbursement, or unable to secure future grants. (Def's Statement, ¶ 24.)

*Plaintiff's Performance Reviews*

NCAP's evaluations rate employee performance as (1) unacceptable, (2) minimum acceptable, (3) good to very good, or (4) exceptional. (Def's Statement, ¶ 25.) Employees who receive an "unacceptable" or "minimum acceptable" rating may be placed on probation. (Def's Statement ¶ 27.) Employees who attain a rating of minimum acceptable or above are eligible to receive an annual merit pay increase. Those who receive an unacceptable evaluation are not eligible for a merit increase, but may be placed on probation and provided an opportunity to increase their ratings to at least "minimum acceptable." (Def's Statement ¶ 28.)

Plaintiff's initial probationary period ended on July 9, 2003, and his post-probation evaluation, dated July 11, 2003, was "good." (Def's Statement ¶¶ 14, 25, 29.)

However, on April 14, 2004, Plaintiff was rated unacceptable in seven categories—work quality and quantity, job knowledge, communication, initiative, planning and organization, managing and developing subordinates, and teamwork—and received an overall evaluation of unacceptable. (Def's Statement ¶ 30.) He was placed on a 30-day probationary period, created an action plan, and was able to increase his rating to minimum acceptable, after which he was given a merit pay increase. (Def's Statement ¶¶ 31-32.)

On April 8, 2005, Plaintiff again received an "unacceptable" evaluation and, this time, was placed on a 60-day probationary period. (Def's Statement ¶ 33.) At the conclusion of the probationary period, his performance was rated "minimum acceptable"

4

and he received a merit pay increase. (Def's Statement ¶ 34.)

Plaintiff received a further evaluation, dated August 8, 2005, and was rated "minimum acceptable." He wrote on that evaluation "I am tired of making promises to my supervisors and not fully completing them. This is the last time that my evaluation will be less than satisfactory to my supervisor and myself." (Def's Statement ¶ 35.)

An evaluation dated April 10, 2006 again ranked Plaintiff's performance as "minimum acceptable" and he received a merit pay increase. On this evaluation, Plaintiff wrote "I am not satisfied with my own time and attendance and will work hard to improve." (Def's Statement ¶ 36.)

On May 24, 2007, Plaintiff's performance was again rated as minimum acceptable, and he was placed on a 30-day probation period. (Def's Statement ¶ 37.) He received a further evaluation of minimum acceptable on August 8, 2007, and another on September 14, 2007. Though his overall rating had not improved, the probationary period was concluded in September. (Def's Statement ¶¶ 38-39.)

Plaintiff received another overall rating of minimum acceptable on April 8, 2008, and received a pay increase. (Def's Statement ¶ 40.)

Throughout his employment, Plaintiff received numerous memos regarding performance issues. (Def's Statement ¶ 48.) In 2007 and 2008, NCAP also received several complaints from clients and donors about Plaintiff's attitude and job performance. (Def's Statement ¶ 46.)

For the years 2003 through 2007, Linda Harrington consistently received overall evaluations of "good to very good" and Mary Ann Cox received overall evaluations of "excellent." (Def's Statement, ¶¶ 42-43.)

5

*Training Opportunities*

NCAP encourages its employees to attend meetings and conferences that pertain to their areas of specialization. Supervisors may recommend training to employees, and employees are encouraged to bring relevant training opportunities to their supervisors' attention. (Def's Statement, ¶ 56.) In 2007, the other Outreach Workers attended at least one training that was not offered to Plaintiff. (Def's Statement ¶ 57, Shears Decl. Ex. 23; Wyssling Aff. Ex. B, 100:7-102:14.) In 2007, Plaintiff's request to attend a two-day grant writing workshop was granted. This training was not offered to the other Outreach Workers. (Def's Statement ¶ 57; Wyssling Aff. Ex. B, 106:4-12.)

In September 2008, Cooper was informed by Palumbo and NCAP's Executive Director, Suzanne Shears, that the agency had received funding to expand its EPIC program to more of the families it served. Plaintiff told his supervisors that he had already taken EPIC training on his own time for his personal use. (Def's Statement ¶ 60; Pl's Statement ¶ 60, Wyssling Aff. 107:17-108:12.) Plaintiff had not requested that he be permitted to attend that training on agency time. (Def's Statement ¶ 61; Wyssling Aff. 107:23-109:5.) He later insisted on retaking EPIC training on NCAP time for the benefit of the agency, and was permitted to do so, even though the training was precisely the same as he had previously attended. (Def's Statement ¶¶ 62-63; Wyssling Aff. 109:6-111:21.)

**B. Procedural Background**

On or about November 7, 2007, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was subjected to differential treatment in the workplace and denied timely raises because of his race.

6

(Brown Decl. Ex. A.) At the conclusion of its investigation, the EEOC provided Plaintiff an undated letter stating, *inter alia*, that a review of the evidence revealed the timing of Plaintiff's pay increases was consistent with NCAP's policy. (*Id*. Ex. B.) The EEOC issued Plaintiff a right-to-sue notice, dated March 26, 2008, stating it was "unable to conclude that the information obtained [during its investigation] establishes violations of the statutes." (*Id*.)

Plaintiff commenced this action on June 24, 2008, claiming differential treatment based on race with regard to: administrative support, performance evaluations, training, and salary increases. He asserted claims under Title VII, the New York State Human Rights Law ("HRL"), the Equal Pay Act, and the New York Labor Law.

Defendant moved for summary judgment on June 30, 2009. In response to the motion, Plaintiff has withdrawn his claims under the Equal Pay Act and New York Labor Law. (Docket No. 43 at 5, fn.1.) Thus, only the claims of race discrimination in violation of Title VII and the HRL remain.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

What is more, Rule 56 requires that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1). Accordingly, statements made in an affidavit that are not based on personal knowledge are insufficient to oppose summary judgment. Duttweiller v. Eagle Janitorial, Inc., No. 05 Civ. 0886, 2009 U.S. Dist. LEXIS 48211, at *3, 186 L.R.R.M. 2778 (N.D.N.Y. Jun. 4, 2009).

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)).

Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." Id.

**B.    Analysis of Race Discrimination Claims**

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-93, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). Likewise, New York's Human Rights Law prohibits discrimination "in compensation or in terms, conditions or privileges of employment" against individuals within the statute's protected classifications. N.Y. EXEC. LAW § 296(a). The same analysis is applied to consideration of parallel federal and state race claims. Cruz v. Coach Stores, Inc., 202 F.3d 560, 565, n.1 (2d Cir. 2000) (applying same analysis to race discrimination claims brought under Title VII and HRL).

Where, as here, there is no direct or overt evidence of discriminatory conduct, courts apply the three-part burden shifting framework of McDonnell Douglas Corp. v. Green, to determine if summary judgment is appropriate. 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). McDonnell Douglas first requires that the plaintiff establish a *prima facie* case of discrimination. In order to do this, the plaintiff must demonstrate, by admissible evidence, that (1) he is a member of a protected class, (2) he is qualified for his

position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. Lawrence v. Nyack Emergency Physicians, P.C., 659 F. Supp. 2d 584, 593 (S.D.N.Y. 2009) (citing cases). "The burden of establishing a *prima facie* case of disparate treatment is not onerous." Burdine, 450 U.S. at 253; *see also*, Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal"). Where a plaintiff is unable to satisfy this minimal showing, summary judgment is warranted.

If the plaintiff meets his initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981)). If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

Assuming the defendant meets its burden at the second stage, the burden returns to the plaintiff to establish that the defendant's stated justification for the adverse employment action is, in fact, a pretext and that the plaintiff's race was a motivating factor in the employer's decision making process. Lawrence, 659 F. Supp. 2d at 593-94. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Weinstock, 224 F.3d at 42. But "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.* (quoting St. Mary's, 509 U.S. at 519).

10

**C. Plaintiff's Failure to Establish *Prima Facie* Case of Discrimination**

There is no dispute that, as an African-American, Plaintiff is a member of a protected class. Defendant also apparently concedes that Plaintiff was qualified for the Community Outreach Worker position. However, Defendant contends that Plaintiff has not established that he suffered an adverse employment action, and even assuming that he did, that the circumstances of the adverse action give rise to an inference of discrimination.

The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions of an individual's employment. Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004); Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). A materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities [and] might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya, 202 F.3d at 640 (internal quotation marks and citations omitted); *see also*, Pimentel v. City of New York, No. 00 Civ. 326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002) ("[W]here there is no loss of salary, benefits, seniority, tenure or promotion opportunities, there is no adverse employment action.").

Plaintiff identified numerous purportedly adverse actions in his Complaint and deposition testimony. However, he apparently concedes that certain incidents he complains of do not constitute adverse employment actions. In response to Defendant's motion, Plaintiff urges that, given the "unique situation" in which he was employed, the following "deprivations" do meet the third prong of the *prima facie* case: (1) he was denied

11

access to the office where the fax machine was kept; (2) he was not permitted to use the food storage room to conduct client interviews; (3) he was denied training opportunities that his co-workers received; (4) his performance was evaluated more stringently than his co-workers'; and (5) his co-workers regularly received raises two months before he did, and his raises were otherwise delayed because he was held to more stringent standards than they were.

### 1. *The Fax Machine*

The fax machine at the Rose Marra Center originally was housed in Carol Palumbo's office, which she locked when she was not at that site. Plaintiff did not have a key. Plaintiff complained to Ms. Shears about his lack of access, but cannot remember when. (Brown Decl. Ex. E, 116:16-17, 117:10-14.) At some time during his employment, Plaintiff sent a client to another NCAP location to use the fax machine. (*Id.* 115:19-116:3.) After this incident, Plaintiff again raised the issue of his lack of access, and the fax machine was placed in the outer office "a short time later." (*Id.* 117:4-9.)

Even assuming Plaintiff had to make alternate arrangements for clients to fax documents on multiple occasions, he has not attempted to show how this was anything more than a mere inconvenience. The Court cannot discern any adverse consequence to Plaintiff from the Complaint or the record. Accordingly, I find Plaintiff's inability to access the fax machine during all of his work hours does not rise to the level of an adverse employment action. *See* Krinsky v. Adams, No. 01 Civ. 5052, 2007 U.S. Dist. LEXIS 38376, at *8-9, 23-24 (E.D.N.Y. May 25, 2007) (alleged limitation on access to room containing necessary supplies did not rise above level of mere inconvenience); Norris v. New York City Hous. Auth., No. 02 Civ. 6933, 2004 U.S. Dist. LEXIS 8619, at *64 (S.D.N.Y.

May 14, 2004) (record showed, incontrovertibly, that withholding office equipment was mere inconvenience).

### 2. *The Food Storage Room*

Plaintiff claims that, unlike the Outreach Workers at other facilities, he had to use a common room to interview clients, and thus was deprived of a professional work setting. Carol Palumbo avers, and Plaintiff does not dispute, that due to the small size of the Rose Marra facility, the common kitchen room is frequently used by all staff at that facility to interview clients. (Palumbo Decl. ¶ 10.) And Plaintiff has presented no evidence to suggest that his use of that space worked a "materially adverse change" in the terms and conditions of his employment. As a result, he fails to make out a *prima facie* case as to this claim. *See* Williams-Velasquez v. Guardian Life Ins. Co., No. 99 Civ. 738, 2003 U.S. Dist. LEXIS 14990, at *38 (S.D.N.Y. Aug. 29, 2003) (defendants' continued denial of plaintiff's request for larger work space was not adverse employment action); Fayson v. Kaleida Health, Inc., 00 Civ. 0860, 2002 U.S. Dist. LEXIS 18591, at *31-32 (W.D.N.Y. Sept. 18, 2002) (being subjected to less-than desirable office space is not an adverse employment action); Banks v. Metro-North Commuter R.R., No. 97 Civ. 1601, 2000 U.S. Dist. LEXIS 508, at *19-20 (S.D.N.Y. Jan. 14, 2000) (absent evidence of materially adverse change, claimed denial of adequate office space not sufficient to establish *prima facie* case).

Plaintiff conceded in his deposition that the Lockport facility, where Ms. Cox has private office space, is a much larger space with a different office configuration. (Brown Decl. Ex. E, 57:17-22, 59:4-62:20.) This Court also summarily rejects Plaintiff's suggestion that a lack of uniformity in the size and configuration of NCAP's offices in three

13

separate communities constitutes an adverse employment action.

### 3. *Training*

Although Plaintiff concedes he attended at least one training that was not offered to other Outreach Workers, he claims NCAP's failure to offer him every training his two co-workers attended was an adverse employment action. Courts in this circuit have held that "[d]enial of training can constitute an adverse employment action where the training 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'" Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (quoting Nakis v. Potter, No. 01 Civ. 11047, 2004 U.S. Dist. LEXIS 25250, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004)).

In his deposition, Plaintiff identified three seminars he believes he should have attended—an energy conference in Batavia attended by both Cox and Harrington (100:19-23), a domestic violence training in Niagara Falls attended by one co-worker (102:1-5), and a family development credentials training that Cox and Harrington may have taken prior to his hire (Wyssling Aff. Ex. B, 105:2-10).[3] Plaintiff has provided no evidence that the trainings he identified were required for his position or were a prerequisite for promotion, much less that the absence of these trainings had an adverse impact on his career or compensation. To the contrary, he confirmed that Palumbo advised him he did not need to have the family development credentialing he sought. (Wyssling Aff. Ex. B, 105:1-106:3.)

Additionally, Plaintiff acknowledged at his deposition that he and the other Outreach

---

[3] Plaintiff initially identified four trainings, but later conceded that he requested, and was granted, the opportunity to attend EPIC training.

14

Workers could request permission to attend seminars they became aware of, which would result, as it did with Plaintiff's grant-writing seminar, in different employees attending different seminars. Plaintiff has not offered evidence that Cox and/or Harrington attended the identified trainings at the behest of NCAP, rather than on their own initiative. Absent any evidence that Plaintiff was denied training related to the requirements of his position, or that his failure to attend a particular training had an adverse impact on his career or salary, he fails to establish a *prima facie* case relative to this claim. Ward v. Empire Vision Ctrs., Inc., No. 08 Civ. 6193, 2010 U.S. Dist. LEXIS 14223, at *8-9 (W.D.N.Y. Feb. 18, 2010) (regardless of whether training is deferred or denied, where it has no impact whatsoever on terms and conditions of employment, it is not an adverse action); Breland-Starling v. Disney Publ'g Worldwide, 166 F. Supp. 2d 820, 825 (S.D.N.Y. 2001 (failure to receive training on particular project may have been unpleasant for plaintiff, but did not com close to adverse employment action); Krinsky, 2007 U.S. Dist. LEXIS 38376, at *8, 23 (denial of request to attend three-day conference did not rise above level of mere inconvenience).

    4.    *Performance Evaluations and Timing of Raises*

Plaintiff's final two contentions are related. He claims that he was held to a more stringent performance standard than his co-workers, and that as a result of his alleged "performance issues," he was denied timely raises. He further contends that Cox and Harrington regularly received their raises in February, while his were not awarded until April, at the earliest.

In response to Plaintiff's latter claim, which appears to have been raised for the first time in response to the instant motion, Palumbo points to NCAP's policy on salary

15

increases, which provides that employees "will receive a step increment annually up to the first Long Step Status of his/her employment's . . . anniversary date subject to a satisfactory evaluation." (Palumbo Reply Decl. ¶ 11, Ex. A.) She also points out that the anniversary date for Plaintiff's full-time Outreach Worker position falls in April, so that raises received in April are consistent with policy. (*Id.* ¶ 12.) Palumbo avers that both Cox and Harrington were hired in February. (*Id.* ¶ 12.) Plaintiff makes no reference to agency policy with regard to his claim, nor has he offered any proof that the agency deviated from policy to the advantage of Cox and Harrington. Accordingly, in this regard, he fails to establish an adverse employment action.

Plaintiff received thirteen performance evaluations between August 11, 2003, when he completed his probation, and April 8, 2008, his last anniversary date prior to filing suit. First, the Court notes that he does not identify any purported adverse action with regard to eleven of those evaluations, and therefore no *prima facie* case is made. "'[N]egative evaluations alone, without any accompanying adverse consequence are not adverse employment actions." Evans v. City of New York, No. 00 Civ. 4197, 2003 U.S. Dist. LEXIS 18281, at *33-34 (S.D.N.Y. Oct. 9, 2003) (quoting Pellei v. Int's Parenthood Fed'n/W. Hemisphere Region, Inc., No. 96 Civ. 7014, 1999 U.S. Dist. LEXIS 15338, at *33 (S.D.N.Y. Sept. 30, 1999)).

On two of his annual reviews, April 14, 2004 and April 8, 2005, Plaintiff received an overall rating of "unacceptable." NCAP's policies provide that an employee with an unacceptable evaluation is not eligible for a salary increase, but may be placed on probation to allow additional time for improvement. Both times, Plaintiff was placed on probation, and after raising his evaluation to "minimum acceptable," received his annual

16

pay increases. (Shears Decl. Exs. 3, 5, 6, 7.) Plaintiff contends that the two-month delay in the receipt of his annual raise on these two occasions is an adverse employment action.

Here, Defendant does not contend that delay in receipt of a salary increase cannot constitute an adverse employment action. It does, however, urge that Plaintiff fails to demonstrate the fourth element of his *prima facie* case—that the circumstances of the delay give rise to an inference of discrimination.

In addition to the delay being consistent with NCAP's stated policy, which Plaintiff does not contend was discriminatorily applied, Defendant takes issue with Plaintiff's "proof" that he was subjected to different performance standards than his Caucasian co-workers.

Plaintiff first contends he was set up to fail because he was given "less than one-third" of a clerical assistant to perform data entry, while Cox and Harrington each had a clerical worker "approximately fifty percent" of the time. In other words, Plaintiff suggests that discriminatory staffing caused his recordkeeping deficiencies. (Cooper Aff. ¶¶ 16-19.) But Plaintiff's affidavit directly contradicts his prior testimony that "the program aide at Niagara Falls assists me fifty percent of the time and does food stamps fifty percent of the time." (Brown Decl. Ex. E, 17:1-10; *see also*, Palumbo Reply Decl. ¶ 4.) "It is well-settled that a party may not defeat ... a motion [for summary judgment] by submitting an affidavit that disputes [or contradicts] his prior sworn testimony." Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir.1991) (citation omitted); Langman Fabrics v. Graf Californiawear, Inc., 160 F.3d 106, 112 (2d Cir.1998) (citation omitted). Thus, Plaintiff cannot establish his *prima facie* case on this contradictory testimony.

Plaintiff further states—all "upon information and belief"—that: he was the only Outreach Worker required to make a specific number of referrals (Cooper Aff. ¶¶54-55),

17

other Outreach Workers also under-recorded data but were not negatively evaluated (¶¶ 59-61), clients made complaints against other Outreach Workers as well, but were encouraged to file complaints only against him (¶¶ 69-71), and Harrington had a worse time and attendance record than he, but he was the only one negatively reviewed in this regard (¶¶ 104-107). (*See* Docket No. 43 at 8 (directing Court to paragraphs purportedly supporting claim of more stringent performance standard).)

Plaintiff's affidavit is essentially the only record evidence introduced in opposition to Defendant's motion. Rule 56 of the Federal Rules of Civil Procedure requires that an opposing affidavit be made on personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(e)(1). Unsupported declarations made upon "information and belief" are not admissible evidence. Therefore, even assuming the two-month delay in Plaintiff's receipt of two salary increases is an adverse employment action, he has not offered any admissible proof that the delay resulted from a disparity in performance standards. Because Plaintiff has not established that the circumstances of the two salary delays give rise to an inference of discrimination, he fails to establish his *prima facie* case.

\* \* \* \*

In sum, Plaintiff has failed to establish a *prima facie* case of discrimination, and summary judgment is warranted. Therefore, the Court need not consider Defendant's further contentions that it had legitimate non-discriminatory reasons for its actions and that Plaintiff cannot show those reasons are pretextual.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary is granted in its entirety.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 32) is GRANTED.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.


Dated: March 31, 2010
      Buffalo, NY

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court